[No. A040647. First Dist., Div. Three. Mar. 23, 1989.]

TILLY GAILLARD, Plaintiff and Appellant, v.
NATOMAS COMPANY et al., Defendants and Respondents.

VINCENT J. ASHTON, Plaintiff and Appellant, v.
DORMAN L. COMMONS et al., Defendants and Respondents.

**COUNSEL**

David B. Gold, Paul F. Bennett, Solomon B. Cera, Lowey, Dannenberg & Knapp, Stephen Lowey and Henry A. Brachtl for Plaintiffs and Appellants.

David G. Robertson, Paul Flum, Neal S. Berinhout, Morrison & Foerster, Pillsbury, Madison & Sutro, William I. Edlund, John F. McLean, Kevin M. Fong, Skadden, Arps, Slate, Meagher & Flom, James E. Lyons, Harriet S. Posner and Jeffrey T. Makoff for Defendants and Respondents.

**OPINION**

**STRANKMAN, J.—**

I

*Statement of the Case*

These shareholder derivative actions[1] arise from the merger of Natomas Company (Natomas) into Diamond Shamrock Corporation

---

[1] Appellant Ashton purportedly appeals from the order granting summary adjudication of issues, which resolves the shareholder derivative claim in *Ashton* v. *Commons*. Summary adjudication of an issue, however, is neither a final judgment nor an order from which an appeal can be taken. (Code Civ. Proc., § 904.1; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 56, 57, pp. 78-80.) Nevertheless, because the shareholder derivative claim in *Ashton* v. *Commons* is identical to the shareholder derivative claims in *Gaillard* v. *Natomas Company,* and because respondents have not objected to the appeal in *Ashton* v. *Commons* on this ground, we choose in our discretion to treat the appeal as a petition for writ of mandate and "dispose of the matter in what we deem to be a practical manner and in the interests of justice." (*Clovis Ready Mix Co.* v. *Aetna Freight Lines* (1972) 25 Cal.App.3d 276, 282 [101 Cal.Rptr. 820].)

(Diamond), effective August 31, 1983. By their complaints, appellant Tilly Gaillard, a common stockholder of Natomas, and appellant Vincent J. Ashton, a common stockholder of Diamond, challenge the purported "golden parachute" agreements[2] and other benefits provided for five inside directors of Natomas as part of the merger.[3]

Golden parachutes are special termination agreements that shelter executives from the effects of a corporate takeover. Their emergence has been attributed to the dramatic increase in the size of corporate takeovers and the volume of hostile takeovers. (See Note, *Golden Parachutes: Untangling the Ripcords* (1987) 39 Stan.L.Rev. 955, 957-958, fn. 14 (hereafter *Ripcords*); Note, *Golden Parachutes: Executive Employment Contracts* (1983) 40 Wash. & Lee L.Rev. 1117, fn. 1.) Typically, golden parachutes provide senior executives who are dismissed or who, under certain circumstances, resign as a result of a takeover with either continued compensation for a specified period following the executives' departure or with a lump-sum payment. The legality and desirability of this form of executive compensation, which some view as a form of corporate looting, have been the subject of increasing controversy faced by courts and addressed by legal commentators. (Note, *Ripcords, op. cit. supra,* 39 Stan.L.Rev. 955; Note, *Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review* (1985) 94 Yale L.J. 909 (hereafter *Golden Parachutes*); Note, *Golden Parachutes—Executive Compensation or Executive Overreaching?* (1984) 9 J. Corp. L. 346; Comment, *Golden Parachutes: A Perk That Boards Should Scrutinize Carefully* (1984) 67 Marq.L.Rev. 293.)

Defendants and respondents, who consist of the five inside directors and the twelve outside directors of Natomas at the time of the merger,[4] contend that the golden parachute agreements and other benefits here are protected

---

[2] As discussed *post,* the parties disagree as to the appropriate labeling of the special termination benefits which are the subject of these actions. Because certain features of the benefits are indicative of that form of executive compensation known as "golden parachutes," we refer to them as such in our opinion.

[3] This is the second appeal in the *Gaillard* action. The first appeal was from an order of dismissal following the sustaining of a demurrer to Gaillard's first amended complaint on the grounds that, following the merger, Gaillard did not retain standing to prosecute her derivative action because she ceased to be a Natomas shareholder. We disagreed and reversed. (*Gaillard* v. *Natomas Co.* (1985) 173 Cal.App.3d 410, 412 [219 Cal.Rptr. 74].)

[4] The 12 outside directors of Natomas at the time of the merger, or their representatives, are Brown Badgett, Daniel A. Collins, Marjorie W. Evans, Mortimer Fleishhacker III, Orville L. Freeman, John P. Hammond, Chandler Ide, Wallace Macgregor, Richard W. Manderbach, Douglas McCormack, Forrest N. Shumway, and Frank C. Osment (substituted by the co-executors of the Estate of Frank C. Osment). The five inside directors, who were also officers of the corporation, were Charles J. Lee, Kenneth G. Reed, John M. Seidl, Dorman L. Commons (now represented by Gerry B. Commons, as executrix of the Estate of Dorman L. Commons), and W. B. Seaton.

by California's "business judgment rule," codified in Corporations Code section 309.[5] The trial court agreed with respondents, granted summary judgment in their favor (Code Civ. Proc., § 437c), and dismissed the actions.

We conclude that the business judgment rule does not apply to a judicial review of the conduct of the inside directors, and reverse as to these respondents. We further conclude that, while the business judgment rule applies to the outside directors, there are triable issues of fact as to whether the adoption of the golden parachute agreements constituted a proper exercise of these respondents' "business judgment," and reverse.

## II

### Facts

The following facts are derived from the extensive record on appeal, including the copies of transcripts of deposition testimony, deposition exhibits, and corporate minutes of directors' meetings. We consider not only this evidence but also all inferences reasonably deducible from such evidence. (Code Civ. Proc., § 437c, subd. (c).)

A. *Tender offer and merger negotiations.* In 1983, Natomas was a publicly held California corporation engaged in petroleum and geothermal exploration and production, domestic coal mining, shipping, and real estate. The bulk of its 1982 operating income derived from its Indonesia operations. Natomas's total gross revenues in 1982 were approximately $1.7 billion with assets valued at approximately $2.8 billion. Net income in 1982 was approximately $44 million.

At that time, the Natomas board of directors consisted of the 12 outside directors and Natomas's five principal officers (see fn. 4, *ante*). The 5 officers were respondent Commons, the chairman of the board and chief executive officer; respondent Lee, a vice-president; respondent Reed, the vice-chairman; respondent Seidl, a vice-president and president of Natomas's domestic oil production subsidiary; and respondent Seaton, president and chief operating officer.

Each of the 12 outside directors had a business career independent of Natomas. Most of them had served as a president, vice-president, director, or some similar position for corporate and banking institutions in the past,

---

[5] All further statutory references are to the Corporations Code unless otherwise indicated.

and many continued to hold such positions.[6] In total, they owned or held an interest in approximately 15 percent of the Natomas common stock.

In May 1983, Diamond initiated a hostile tender offer to acquire 51 percent of Natomas's common stock at $23 per share. Diamond stated in the tender offer that it intended to acquire the remaining shares of Natomas common stock in a later merger in which Natomas stock would be converted into the stock of New Diamond Corporation (the holding company formed for the purpose of merger). After considering various alternative responses to the tender offer, Natomas representatives agreed to meet with Diamond representatives on May 29, 1983.

Prior to the meeting, Commons directed the Natomas compensation committee to meet on May 30 to review proposed amendments to executive employment agreements for key executives. At this time, Commons and Reed already were entitled to golden parachute benefits in the event of a takeover. For example, Commons's employment agreement provided that in the event of his termination by Natomas for any reason other than cause, he was entitled to payment of his annual salary of $450,000 for a three-year period. Reed's employment agreement provided that in the event of merger or takeover, he was entitled to payment of his base annual salary for the remainder of the three-year term of the agreement through December 31, 1985.[7] As discussed *infra,* that these officers already were protected by golden parachutes in the event of a takeover is significant in relation to respondents' contention that the golden parachute agreements under attack here were necessary to facilitate the merger.

At the group meeting on May 29, Commons, on behalf of Natomas, led a team that included Natomas's outside counsel, Joseph H. Flom, who spe-

---

[6] Brown Badgett was the former president of Brown Badgett, Inc. Daniel A. Collins was a consultant to Harcourt Brace Jovanovich, Inc. Marjorie W. Evans was an attorney, corporate consultant, and a director of Rainier Bancorporation. Mortimer Fleishhacker III was chairman of Pyramid Savings and Loan Association. Orville L. Freeman was the former United States Secretary of Agriculture, chairman of Business International Corporation, and a director of Grumman Corporation. John P. Hammond was an independent petroleum consultant and an advisory director of First Tulsa Bancorporation. Chandler Ide was an advisory director to BanCal Tri-State Corporation. Wallace Macgregor was an independent metals and minerals advisor, and also served as a director of Homestake Mining Company. Richard Manderbach was a former senior vice-president of a division of Bank of America. Douglas McCormack was a director of the Bank of Rio Vista. Frank C. Osment was a former executive vice-president of Standard Oil Company (Indiana) and director of Harris Bankcorp, Inc. and McGraw-Edison. Forrest N. Shumway was the chairman and chief executive officer of the Signal Companies, Inc., and was a director of five major corporations.

[7] Although appellants state that Lee, Seidl, and Seaton also were entitled to payment of benefits in the event of their termination for reasons other than cause, the record is unclear as to the terms of such benefits.

cialized in corporate takeovers and mergers, and Natomas's investment bankers. The Diamond team was led by William H. Bricker, its chairman and chief executive officer. Following the group meeting, Commons and Bricker met alone for further negotiations and reached agreement on the terms of a friendly merger which would result in the withdrawal of the tender offer and the execution of a plan of reorganization. The agreement included certain significant changes from the terms of the original tender offer: (1) the transaction would be changed from part cash to all stock; (2) Natomas's real estate and shipping subsidiaries, including American President Lines (APL), would be spun off as a separate public company, American President Companies (APC); (3) Natomas's shareholders would receive 1.05 New Diamond Corporation shares for each Natomas share instead of the previously offered .92.

Following this meeting between Bricker and Commons, Commons met with the Natomas group, including Flom, to discuss executive employment agreements. Commons suggested that he propose to Bricker severance arrangements for all employees, and the amendment of employment agreements for 17 key executives to include golden parachute provisions comparable to those provided to Diamond executives. Commons testified that he thereafter met with Bricker and discussed severance payments and the amendment of employment agreements. The minutes of a subsequent board of directors meeting state that "Natomas' management was extremely careful not to discuss any of these arrangements until the terms of the merger were developed and the consideration to be exchanged was fixed." Commons testified that Bricker consented to the proposed agreements on May 29.

In deposition, Bricker testified that he did not recall discussing employment agreements for Natomas senior management on May 29. He recalled Commons advised him on May 30 that the compensation committee was reviewing amended employment agreements for key executives, and Bricker stated he would be amenable to them, recognizing "the need for everyone to be enthusiastic and highly supportive of the deal."

Commons then returned to the Natomas group and instructed Flom to draft agreements with new golden parachute provisions for his review prior to the meeting of the compensation committee the following morning.

B. *Golden parachutes.* The following morning, Flom reviewed with Commons drafts of the employment agreements he had prepared. As to golden parachutes, the amended agreements ultimately provided that Commons and Reed *could terminate their employment within six months following the merger "for Good Reason," or for any reason following the six-month period,*

*and thereupon receive a lump-sum payment equal to five times their total annual compensation. The lump-sum payment would be reduced proportionate to the length of time they remained employees of Natomas following the six-month period.*

Lee's agreement was similar to those of Commons and Reed, except that he was entitled to a lump-sum payment equal to his total annual compensation multiplied by the greater of the number of years remaining in the term of his employment contract (which was for seven years), or the number one.

Seidl's agreement was similar to the other three except that he was entitled to a lump-sum payment equal to three times his total annual compensation.

C. *Compensation committee meeting and board of directors meeting on May 30.* The compensation committee met at 10 a.m. on May 30. The committee was comprised of five of the twelve outside directors of Natomas—Macgregor, Manderbach, McCormack, Osment, and Shumway. Because Shumway, the committee's chairman, was absent, Macgregor chaired the meeting. Flom, Leskin (a Natomas vice-president), and Mandel (Natomas's general counsel) also attended. At the beginning of the meeting, Commons advised all present that a tentative merger agreement had been reached with Diamond and gave an outline of the agreement. He then stated that the matter of employee compensation would be addressed by Flom, and left the meeting. Flom proceeded to describe the course of the merger negotiations following the tender offer, and explained the proposed terms of the stock exchange.

Flom then discussed the substance of the proposed employment agreements, and Leskin distributed a summary of the material terms. Flom stated that a concern of the directors should be that "management is clearly in place" upon the consummation of the merger, and that the proposed agreements would ensure continuity in management. Flom also stated that the terms of the agreements, as summarized, were acceptable to Bricker of Diamond and that Bricker wanted Natomas's confirmation of the agreements.

The committee then discussed employment arrangements for Seaton, who at that time was president and chief operating executive of APL, a subsidiary of Natomas. Upon consummation of the merger, Seaton would become head of the newly spun-off entity of APC, and terminate his existing employment agreement with Natomas. Committee members commented that Seaton was the only executive fully cognizant of the problems peculiar to Natomas's Indonesia operations, and agreed that Natomas would not

"want to see that guy lost." They therefore agreed that, in addition to a new employment contract with APC, they would offer Seaton a "consulting agreement" with Natomas, operative upon consummation of the merger. The consulting agreement provided for payment to Seaton of $250,000 annually for a period of four years after the effective date of the merger. During the four-year consulting period, Seaton could engage in any other business or employment activities, on a full-time basis in any field, and continue to receive the $250,000 annual compensation.

The committee concluded by agreeing to recommend that the employment agreements and consulting agreement be entered into by Natomas. Macgregor, who chaired the meeting, stated that, in so doing, ". . . the committee relied on Mr. Flom . . . ." The compensation committee adjourned at 11:55 a.m.

The full board of directors, including Commons, then met. An investment advisor spoke on corporate takeovers in general, and the directors discussed the terms of the proposed merger. Macgregor then addressed the board concerning the amended employment agreements. In his deposition testimony, Macgregor stated that he did not "recall going into specific detail," but represented that the compensation committee understood that Diamond considered the agreements essential to the transaction and that the committee recommended the agreements. The Natomas officers present, including Commons, then left and Flom spoke to the board. He stated that in mergers, it was common to adopt arrangements to ensure continuity of management and provide economic protection for those key employees who might be affected. The board meeting minutes reflect that Flom represented that Diamond had agreed that the key Natomas employees should be provided employment arrangements to serve these purposes. Leskin then reviewed for the board the basic terms of the employment agreements.

At the conclusion of the meeting, the board approved the proposed plan and agreement of reorganization to implement the merger, and further approved the amended employment agreements as proposed.

D. *June 28 compensation committee meeting and board of directors meeting.* The record does not show that the amended employment agreements were considered further by the directors until the next compensation committee meeting on June 28. The committee's agenda reflects the meeting was called to "[a]pprove the final forms of proposed employment agreements . . . ." Shumway opened the meeting by opining that the appropriateness of the agreements was primarily a concern of Diamond and that if Diamond acquiesced it was unlikely that the committee would find it appropriate to dissent. Leskin then distributed a schedule summarizing the cost implica-

tions of the proposed amended employment agreements, but the record reflects that the committee did not discuss the agreements further before voting to approve them.

Immediately after the compensation committee adjourned, the full board of directors convened. Shumway advised that Diamond had approved the golden parachutes. Without further discussion, the board, with the five inside directors present but abstaining from voting, then voted to follow the recommendation of the compensation committee and approved the amended agreements.

E. *Consummation of merger and resignation of respondent inside directors.* On August 2, 1983, Natomas distributed a proxy statement soliciting shareholder approval of the merger. The proxy statement fully described the terms of the amended employment agreements which constituted a component of the merger. On August 30, 1983, the Natomas shareholders voted to approve the merger.

Although the purported purpose of the golden parachutes was to encourage the retention of key executives for a transition period following the merger, all four key executives who were the beneficiaries of the agreements terminated their employment with Natomas shortly after the consummation of the merger. The record supports the inference that the executives themselves created, at least in part, the "good reason" for leaving Natomas which triggered the golden parachutes. According to Bricker, prior to the effective date of the merger, Diamond had reached an understanding with Natomas that a Diamond employee, McDoulett, would become the chief operating officer of Natomas. On August 30, however, at a Natomas board of directors meeting, Reed was installed as the president and chief operating officer of Natomas. In his deposition testimony, Bricker described Diamond's reaction to such action: "A. After the stockholders meeting whereby the Natomas shareholders approved this transaction, we had a—we, the management of Diamond Shamrock had a surprise, in that without prior consultation, indeed, different than the prior plans, Mr. Reed was designated president of Natomas, and that designation was contrary to and certainly a surprise to all of us, because Mr. McDoulett was to have been designated president of Natomas, and Mr. Reed was to have retained his position as vice chairman. [¶] This started a period of difficulties, in terms of philosophy, and culminated sometime later in an understanding that possibly our differences of operating philosophy are such that we can't work together."

In October and November 1983, Commons, Reed, Lee and Seidl gave notice of their voluntary termination of their employment with Natomas,

effective December 31, 1983. Shortly thereafter, they were paid approximately $10 million under the golden parachute provisions.

Seaton continued to be paid $250,000 per year through August 31, 1987, pursuant to his consulting agreement. The record establishes he provided minimal services only during this period. He participated in some telephone conversations and offered his opinion on the integrity of Indonesian governmental officials. The record indicates he devoted less than one full day during the total four-year period to consulting services.

F. *Allegations of complaints.* The first amended complaint of Tilly Gaillard for damages alleges that the adoption and implementation of the golden parachute agreements and the consulting agreement constituted a breach of fiduciary duty by all 19 directors of Natomas, waste and mismanagement, negligence, and conversion. The third amended complaint of Vincent J. Ashton for damages alleges an abdication and breach of the directors' fiduciary duties.

## III

### *Business Judgment Rule*

■ The common law "business judgment rule" refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. The business judgment rule is premised on the notion that those to whom the management of the corporation has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is one which is " '. . . helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes . . . ,' " and establishes a presumption that directors' decisions are based on sound business judgment. (*Eldridge* v. *Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776 [230 Cal.Rptr. 815].) ■ Under this rule, a director is not liable for a mistake in business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation, where no conflict of interest exists. (1 Marsh, Cal. Corporation Law (2d ed. 1988) § 10.3, p. 572; see *Fornaseri* v. *Cosmosart Realty etc. Corp.* (1929) 96 Cal.App. 549, 557 [274 P. 597].)

Notwithstanding the deference to a director's business judgment, the rule does not immunize a director from liability in the case of his or her abdication of corporate responsibilities: " '. . . When courts say that they will not interfere in matters of business judgment, it is presupposed that judgment—reasonable diligence—has in fact been exercised. A director cannot close his eyes to what is going on about him in the conduct of the business of the

corporation and have it said that he is exercising business judgment. Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them. . . .'" (*Burt* v. *Irvine Co.* (1965) 237 Cal.App.2d 828, 852-853 [47 Cal.Rptr. 392].)

Section 309 (Stats. 1975, ch. 682, § 7, pp. 1537-1538, eff. Jan. 1, 1977) codifies California's business judgment rule. (See 1 Marsh, *op. cit. supra,* § 10.3, pp. 573-574, 575.) Section 309 incorporates the concept of a director's immunity from liability for an honest mistake of business judgment with the concept of a director's obligation of reasonable diligence in the performance of his or her duties (*id.,* at pp. 574-575), and provides: "(a) A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. [¶] (b) In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by: [¶] (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented, [¶] (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence, or [¶] (3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as in any such case, the director acts in good faith, after reasonable inquiry when the need therefore is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted. [¶] (c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director."

■ The provisions for a director's right to rely in subdivisions (a) and (b) of section 309 enlarge the right of reliance under prior law (former § 829). (Legis. committee com., 24 West's Ann. Corp. Code (1977 ed.) § 309, p. 186.) By the provision permitting reliance upon a committee of the board, the drafters of section 309 intended to permit reliance upon the work product of a board committee resulting from a more detailed investigation undertaken by that committee and which forms the basis for action taken by the board. (*Ibid.*) However, the duty of "reasonable inquiry" in subdivision (b) constitutes a condition to the right of reliance, such that directors

may not close their eyes to what is going on about them in corporate business, and must in appropriate circumstances make such reasonable inquiry as an ordinarily prudent person under similar circumstances. (*Ibid.*)

The term "under similar circumstances" requires a court to consider the nature and extent of a director's alleged oversight or mistake in judgment in the context of such factors as the size, complexity and location of activities involved, and to limit the critical assessment of a director's performance to the time of the action or nonaction and thereby avoid harsher judgments which can be made with benefit of hindsight. (Legis. committee com., 24 West's Ann. Corp. Code, *supra,* § 309, p. 186.)

Our research reveals no judicial decision to date which has taken a definitive position on the application of the business judgment rule to golden parachute agreements. (See *Brown* v. *Ferro Corp.* (6th Cir. 1985) 763 F.2d 798 [suit challenging corporation's enactment of golden parachutes dismissed as not ripe]; *Schreiber* v. *Burlington Northern, Inc.* (3d Cir. 1984) 731 F.2d 163, 167 [question of management's breach of fiduciary duty in enacting golden parachutes not properly before the court], affd., 472 U.S. 1 [86 L.Ed.2d 1, 105 S.Ct. 2458] (1985).)[8]

■ Because the form and amount of executive compensation are fundamentally corporate business decisions, and because, as discussed *infra,* golden parachutes often serve a valid corporate function, we determine that section 309 governs our review of the conduct of the outside directors in approving the golden parachutes and the consulting agreement.

■ We further conclude, however, that, as a matter of law, our review of the conduct of the inside directors is not governed by section 309. The inside directors did not vote on the approval of the golden parachutes or consulting agreement. In securing the payment of these benefits to themselves, they were not "perform[ing] the duties of a director" as specified in section 309, but were acting as officer employees of the corporation. The judicial deference afforded under the business judgment rule therefore should not apply. ■ As stated by Marsh in his discussion of section 309: "[Section 309, subdivision (a)] does not relate to officers of the corporation, but only to directors. . . . [A]n officer-director might be liable for particular conduct because of his capacity of an officer, whereas the other directors would not." (1 Marsh, *op. cit. supra,* § 10.3, at p. 576.) This result is in accord with the premise of the business judgment rule that courts

---

[8]Most commentators, however, have predicted that courts will apply the business judgment rule of current corporation law to golden parachutes. (See Note, *Ripcords, op. cit. supra,* 39 Stan.L.Rev. 955; Note, *Golden Parachutes, op. cit. supra,* 94 Yale L.J. at p. 912.)

should defer to the business judgment of *disinterested* directors who presumably are acting in the best interests of the corporation.

## IV

### *Background on Golden Parachutes*

We look at the recognized valid corporate functions served by golden parachutes as well as their recognized potential for executive self-dealing, so that we may review the actions of the directors in the context of these valid functions and the potential for abuse.

 Corporate takeovers often threaten the financial and professional security of the managers of target companies.[9] The theoretical purpose of golden parachutes is to shelter senior executives from such threat. To this end, the two principal recognized functions of golden parachutes are (1) to foster executive objectivity toward merger and tender offers; and (2) to attract top executives to companies and industries where the odds of takeover are high. (Note, *Ripcords, op. cit. supra,* 39 Stan.L.Rev. at p. 958; Note, *Golden Parachutes, op. cit. supra,* 94 Yale L.J. at pp. 914-917.) As to the first function, a threatened takeover gives rise to the potential for conflict between executives' personal interests and the interests of shareholders. Golden parachutes align the interests of management more closely with those of shareholders by insuring executives against the possible pecuniary or nonpecuniary losses that may result from a change of control. A properly designed takeover will theoretically make its beneficiary indifferent between remaining in control of the corporation and supporting a takeover beneficial to the shareholders. (*Ibid.*)

As to the second function, golden parachutes provide long-term incentives for top quality management executives to enter industries and corporations in which the potential for takeover is above average. (Note, *Ripcords, op. cit. supra,* 39 Stan.L.Rev. at p. 959; Note, *Golden Parachutes, op. cit. supra,* 94 Yale L.J. at p. 917.)

Most commentators agree that, in view of these two functions of golden parachutes, a golden parachute should be negotiated as part of an executive's overall compensation package, and that parachutes enacted in the midst of takeover negotiations should be discouraged. A parachute conferred following a tender offer will likely have little value in creating execu-

---

[9] We distinguish a "takeover" from another newly controversial form of corporate change of control, the "leveraged buy-out," in which a company's managers use borrowed money to buy the company from its shareholders.

tive objectivity because the executives generally already will have taken an initial position on the takeover before the golden parachutes are adopted and may not be able to credibly take a different stance at a later time. Further, during a takeover battle, the target corporation has no need for the parachute's executive-recruiting functions. For these reasons, parachutes that are adopted in response to actual takeover overtures have been viewed as last minute appropriations of corporate assets or, alternatively, attempts to discourage potential acquirers. (See *Bender* v. *Highway Truck Drivers & Helpers Local 107* (E.D.Pa. 1984) 598 F.Supp. 178, 189, fn. 16, affd., 770 F.2d 1066 (3d Cir. 1985); A.B.A. Subcommittee on Executive Compensation, *Executive Compensation: A Road Map for the Corporate Advisor* (1984) 40 Bus. Law 219, 349; Note, *Ripcords, op. cit. supra,* 39 Stan.L.Rev. at pp. 974-975.) One author recommends: "Prohibiting the implementation of golden parachutes during a takeover is probably desirable. During a takeover, executives will have significant bargaining power to demand excessive golden parachutes in return for not opposing the transaction. Moreover, since both the executives and the directors probably will soon be replaced, they will have little concern over how the stockholders may react to the golden parachutes. . . . Prohibiting the implementation of golden parachutes during takeovers creates an incentive for corporations to adopt golden parachutes prior to a takeover, thereby avoiding the above-mentioned problems." (Note, *Golden Parachutes, op. cit. supra,* 94 Yale L.J. at p. 921, fn. 58.)

In addition to the timing of the implementation of golden parachutes, their amounts have been challenged as excessive in relation to any possible benefit conferred upon the corporation. Congress's enactment of new tax laws responds in part to this concern. Under the Deficit Reduction Act of 1984 (Int.Rev. Code, §§ 280G, 4999), golden parachutes that give executives payments greater than or equal to three times their total annual compensation are presumed excessive for tax purposes, resulting in the corporation's losing its deduction for the golden parachute payments as well as in the imposition of a 20 percent excise tax on the beneficiaries of the payments.

## V

### *Appellate Standard of Review*

The application of section 309 to the judicial review of a director's actions raises various issues of fact, e.g., whether a director acted as an ordinarily prudent person under similar circumstances, and in the best interests of a corporation; and whether he or she made a reasonable inquiry as indicated by the circumstances. Such questions generally should be left to a trier of

fact. However, on a motion for summary judgment, where the evidence establishes that there is no controverted material fact, such questions become ones of law. (Code Civ. Proc., § 437c, subd. (c).) ■■■ The function of the trial court in ruling on respondents' motions for summary judgment was merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62].) Our function is the same as that of the trial court.

## VI

### Discussion—Application of Section 309 to Golden Parachutes and Consulting Agreement

A. *Liability of inside directors.* The five inside directors who were the beneficiaries of the golden parachutes and the consulting agreement abstained from voting on their approval, and, accordingly, are not subject to liability on the ground of having approved the amended employment agreements.

■■■ As discussed *ante,* these inside directors were not performing the duties of a director in seeking approval of the agreements or accepting the benefits thereunder. Section 309's standard of care therefore does not apply to a determination of their liability on appellants' claims, and the trial court's reliance on section 309 in granting summary judgment in their favor constituted error.

The record discloses issues of fact on appellants' claims of, inter alia, breach of fiduciary duty and waste as to the five inside directors, which cannot be resolved as a matter of law on the basis of the record before us. As to Seaton, the record is unclear as to the nature and extent of his participation in the events which led to the proposal of the consulting agreement. Although the record shows that the consulting agreement, on its face, served a valid corporate purpose, and the outside directors are immune from liability as to this particular agreement under section 309 (see discussion, *ante*), the record is inadequate to determine as a matter of law that Seaton's conduct incident to the adoption of the agreement comported with his fiduciary duties. Although the fairness of the agreement to the corporation must be judged at the time of its adoption, the fact that Seaton provided, at the most, minimal services in return for his annual $250,000 salary raises at least the inference that the agreement was not in the best interests of Natomas at the time of its adoption. Summary judgment as to all five inside directors therefore must be reversed.

B. *Liability of outside directors.* ■■■ We next look to whether the conduct of the outside directors in approving these benefits can withstand judicial scrutiny as a matter of law under section 309.

The record does not disclose that the outside directors had any personal interest in the benefits, and does not show any conflict of interest or evidence of bad faith on their part in approving the benefits.

Our inquiry, therefore, is whether the record discloses controverted issues of fact as to whether the outside directors acted in a manner they believed to be in the best interests of Natomas, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances (§ 309, subd. (a)); and whether, in relying upon various sources, they made reasonable inquiry if the need therefor was indicated by the circumstances (§ 309, subd. (b)). We reach a different conclusion as to the directors' approval of the golden parachutes than we reach as to their approval of Seaton's consulting agreement.

We turn first to the outside directors acting in their capacity as members of the compensation committee. The record shows the compensation committee was persuaded to approve the amended employment agreements for 17 key executives after the initial 2-hour meeting on May 30. The record indicates that the committee members devoted less than two hours to the consideration of these employment agreements, five of which alone would provide for payment of approximately $11 million to executives following the consummation of the merger.

Flom stated that continuity in management should be a concern of the Natomas board and that the golden parachutes would serve that purpose. Flom did not explain, however, how the purported golden parachutes would serve such purpose, and the record does not indicate that any of the committee members requested further explanation of his conclusory opinion or analyzed among themselves how such purpose would be served by the amendments. The director who chaired the meeting indicated that the committee relied entirely upon Flom when agreeing to recommend the agreements.

We find that with the evidence before us, we cannot say *as a matter of law* that the compensation committee members were justified in relying to the extent that they did upon Flom in approving the golden parachutes, or that the circumstances did not warrant further reasonable inquiry under section 309, subdivision (b). We so conclude for the following reasons.

First, the golden parachutes, by their terms, would not serve the recognized valid functions of golden parachutes discussed *ante*. Because they were discussed after the terms of the merger had been negotiated and agreed upon, the function of executive objectivity would not be served. Bricker indeed indicated that he agreed to them primarily to keep the level of

enthusiasm for the merger high. In addition, because they were provided to existing executives, the function of attracting top-level management obviously was not served. Significantly, the existing employment agreements for Commons and Reed, of which the committee members should have been aware, already provided golden parachutes which served the desirable functions of these forms of compensation. The record provides no explanation why these executives needed to make their benefits more "golden."

Second, Flom asserted that the golden parachutes served the purpose of ensuring continuity of management. Certain respondents at one point therefore refer to the benefits as "golden handcuffs," rather than golden parachutes. The very terms of the amended agreements, however, indicate that the opposite purpose would be served, and that they in fact would encourage the executives to leave Natomas within the six-month period following the merger or shortly thereafter. The testimony of appellants' proposed expert witness explained that typically, a "golden handcuff" is a reward given to an executive for staying with the company in conjunction with a detriment for leaving, but that with the instant agreements, the executives were encouraged to leave as soon as possible.[10]

In deposition, Shumway testified that the purpose of the golden parachutes was to "buy" six months time which would "prevent a hell of a lot of chaos . . . by keeping those key people on the job through the amalgamation of the two entities, learning what the problems are and the like. . . . [¶] . . . [I]t's a small price to pay in a billion dollar deal when you look at the consequences that could result from a fumbled ball in Indonesia or a problem in the North Sea . . . ."

We do not dispute that a trier of fact might find this explanation of the purpose of the golden parachutes to be reasonable, but we find that the evidence would reasonably support an inference to the contrary. Further, the "good reason" condition to leaving Natomas during the six-month period appears to be so broad as to provide the executives with a ready justification to terminate their employment and collect the benefits immediately after the effective date of the merger, before the expiration of the six-month period.

Third, the golden parachutes payable to Commons, Reed, and Lee exceeded the three-year annual salary lump-sum limit under the Deficit Re-

---

[10]The copy of portions of the transcript of the deposition testimony of the proposed expert appeared in support of appellants' motion for reconsideration below, which was denied. Respondents contend it is therefore not properly part of the record on appeal. We do not rely on this testimony, however, as part of the grounds for reversal, but refer to it for purposes of clarifying our opinion.

duction Act, and therefore would be considered excessive for tax purposes under current law. Although these tax provisions, effective in 1984, apparently were not applicable to the 1983 merger, the compensation committee members arguably should have been aware of the pendency of such legislation affecting matters within their purview, and that the lump-sum payments in question would be excessive under the new tax laws.

Fourth, the compensation committee members should have been aware that Commons had proposed the amendment of the employment agreements and that Flom had been acting in accordance with Commons's instructions in preparing drafts of the employment agreements. Evidence of this close connection between Commons, a beneficiary of a golden parachute agreement, and Flom in formulating the terms of the agreements, would support the inference of self-dealing which should have been investigated further by the compensation committee.

A trier of fact could reasonably find that the circumstances warranted a thorough review of the golden parachute agreements by the members of the compensation committee to determine whether they served the best interests of the corporation. Thus, although a trier of fact might conclude that the compensation committee's reliance upon Flom with no further inquiry was reasonable, it could also reasonably find that the members of the compensation committee should have, at the very least, independently reviewed the terms of the golden parachutes to consider whether they served a valid use of corporate funds or constituted executive overreaching.

 We reach a different conclusion as to the approval of the consulting agreement. The record indicates the compensation committee members themselves raised the issue of the need for the consulting agreement, and perceived that such agreement would serve a valid and necessary purpose for Natomas. Whether Seaton ultimately rendered $250,000 worth of services per year is irrelevant under the business judgment rule and section 309. We therefore conclude the compensation committee members are not liable as a matter of law for their recommendation to approve the consulting agreement.

 We finally turn to the conduct of the outside directors who were not on the compensation committee. Under section 309, these directors were entitled to rely upon the recommendation of the compensation committee, which they believed "to merit confidence" (§ 309, subd. (b)(3)) and were not required to initiate their own independent investigation. However, in this case, the nature of these particular golden parachute agreements and the timing of their proposal create a triable issue of fact as to whether *some* further inquiry should have been made by the board members who were not

on the compensation committee. Even as of the date of the merger, golden parachutes were highly controversial (see *Golden Rip-offs,* Industry Week (July 25, 1983) p. 46; *Those Executive Bailout Deals,* Fortune (Dec. 13, 1982) p. 82). The board members, who presumably were appointed to the board because of their business and financial acumen, likely had, or should have had, some knowledge of this controversy. The proposal of the golden parachutes here under somewhat suspicious circumstances, i.e., *after* the tender offer and in the midst of merger discussions, raises the question of whether these directors should have examined the golden parachutes more attentively.

We perceive that in most cases, directors should be allowed to rely largely upon the recommendation of a board committee as to matters delegated to that committee. Otherwise, the directors' right to rely under subdivision (b) of section 309 would be rendered meaningless, and special committees would be unable to serve any useful function for the board. However, there is a triable issue as to whether the directors' general knowledge of the questionable nature of golden parachutes within the context of takeovers would cause such total reliance to be unwarranted.

We recognize that the amount of benefits provided under the golden parachutes and paid to the executives is not overwhelming in proportion to the net worth of both Natomas and Diamond, and the multi-billion dollar values involved in the merger. Nevertheless, the use of corporate funds for purposes which are not in the best interests of the shareholders cannot be excused simply because the opportunity for such occurs in the course of a takeover or merger which results in an overall financial gain for the shareholders.

VII

*Effect of Shareholder Approval of Merger Agreement and Ratification by Diamond*

Although the trial court relied upon the business judgment rule in granting summary judgment, respondents contend that its decision can be sustained on two other grounds which they asserted below: shareholder approval of the merger agreement under section 310, subdivision (a)(1), and corporate ratification.

Section 310 provides in part, as to a contract between a corporation and one of its directors: such contract is not void or voidable on the ground that the director is a party to the contract or was present at the meeting of the board which authorized, approved or ratified the contract, if (1) the materi-

al facts as to the transaction are fully disclosed to the shareholders and then the contract is approved by them (§ 310, subd. (a)(1)); or (2) the material facts as to the transaction are fully disclosed to the board which then ratifies the contract by a vote sufficient without counting the vote of the interested director, and the contract is just and reasonable as to the corporation at the time it is authorized, approved or ratified (§ 310, subd. (a)(2)).

If such contract is not so approved in one of these two manners, then the person asserting the validity of the contract sustains the burden of proving that the contract was just and reasonable as to the corporation at the time it was authorized, approved or ratified. (§ 310, subd. (a)(3).)

Respondents argue that all material facts concerning the employment agreements were disclosed to the shareholders in the proxy statement that solicited their approval of the merger, and that the shareholders thereafter voted to approve the merger, including the component of the employment agreements. Under section 310, subdivision (a)(1), respondents argue, the employment agreements are immune from attack.

Respondents' reliance on section 310, subdivision (a)(1), as a bar to these shareholder derivative actions is misplaced. Under section 310, subdivision (a), a contract is automatically void or voidable on the ground a director is a party to the contract, unless certain alternative requirements are met. If these requirements, including shareholder approval, are met, the contract is no longer void or voidable on the ground the director is a party thereto.

The satisfaction of section 310's requirements, however, does not render such contract immune from attack on other grounds, such as corporate waste, and does not render the directors immune from liability for breach of fiduciary duty as a result of their approval of such contract. Marsh is in accord: "[R]egardless of the provisions of Section 310, a transaction with an interested director which is found to be unjust and unreasonable to the corporation could not be legally sustained." (1 Marsh, *op. cit. supra,* § 9.4, at p. 490.)[11]

Respondents also contend that the order granting summary judgment can be sustained on the ground that, following the consummation of the merger, Diamond ratified the new employment agreements. Under the doctrine of ratification, a corporation is estopped from denying the validity or enforceability of a contract, after accepting performance and

---

[11] Because we hold that section 310, subdivision (a), does not operate to bar appellants' claims, we need not determine whether the requirements of that section—full disclosure to the shareholders of the material facts of the contract and the directors' interest therein, and shareholder approval under section 153—were satisfied here.

making payment on account thereof. (See *Berry* v. *Maywood Mut. W. Co. No. One* (1939) 13 Cal.2d 185, 190 [88 P.2d 705].)

 The doctrine of corporate ratification is not applicable to these shareholder derivative actions in which shareholders, and not the corporation directly, claim a wrong perpetrated on the corporation by its directors. As in any other shareholder derivative action, the corporation is a nominal party only.

We conclude these actions are not barred under section 310, subdivision (a)(1), or the doctrine of corporate ratification.

## VIII

### *Disposition*

Summary judgment on the Gaillard complaint and summary adjudication of issues on the Ashton complaint in favor of Seaton are reversed. Summary judgment and summary adjudication of issues in favor of the remaining inside directors are reversed. Summary judgment and summary adjudication of issues in favor of the outside directors are reversed, except as to the claim of liability for Seaton's consulting agreement. Appellants are awarded costs on appeal.

White, P. J., and Barry-Deal, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 1, 1989. Broussard, J., did not participate therein. Lucas, C. J., and Mosk, J., were of the opinion that the petition should be granted.