FEDERAL DEPOSIT INSURANCE CORPORATION, a corporation existing under the laws of the United States, Plaintiff–Appellant,

v.

Robert K. CASTETTER; Jon Chester; Arthur E. Engel; Anthony L. Pierangelo; Dennis L. Russell; Jon R. Stockholm, Defendants–Appellees.

No. 97–56775.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1998

Filed July 21, 1999

Richard A. Higgins, Law Offices of Richard A. Higgins, San Diego, California, for defendants-appellees Anthony J. Pierangelo and Jon Stockholm.

Before: PREGERSON, D. W. NELSON, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal, we must decide whether, under the California business judgment rule, directors of a federally-insured national bank may be held individually liable for losses sustained by the bank under a theory of simple negligence. We conclude that, under the circumstances of this case, the California business judgment rule insulates the directors from liability, and affirm the district court.

I

This case arises from the failure of the Balboa National Bank ("the bank"), a federally-insured national bank located in National City, California. Edward Peterson, a banker with twenty-six years of experience, including a tenure as a senior banking examiner for the state of California, obtained a federal charter for the bank and opened it in February 1983. Peterson was President, Chief Executive Officer ("CEO"), and the only inside member of the board of directors. Peterson solicited individuals to serve as outside directors on the bank's board, including defendants Jon Chester, Arthur Engel, Anthony Pierangelo, and Jon Stockholm.[1] Although some of the outside directors had served on boards of directors in the past, none had any significant banking experience and all were engaged in other professions. Engel was the chief executive officer of a ship repair firm in San Diego; Stockholm was an engi-

Maria Beatrice Valdez, Federal Deposit Insurance Corporation, Washington, D.C., for the plaintiff-appellant.

Jon P. Chester, pro per, Law Offices of Jon P. Chester, San Diego, California, defendant-appellee.

Gary W. Majors, Majors & Fox, San Diego, California, for defendant-appellee Arthur E. Engel.

---

1. Only these four directors proceeded to trial and are appellees here.

neering contractor, specializing in marine construction; Pierangelo was a physician in general practice; and Chester was an attorney. Each director invested personal funds in the bank.

Peterson placed much of the bank's loan portfolio into automobile lending. He discussed this with the directors and explained that he believed that this would be appropriate because of the bank's proximity to the "Mile of Cars," a nearby auto row. Peterson hired Frances Cragen, an experienced and high-level employee in Bank of America's auto loan department, to work for Balboa's auto loan department. A January 1984 Office of the Comptroller of the Currency ("OCC") report contained no criticisms of Balboa. Peterson continued to assure the directors that the bank was doing well and that its loan delinquency rates were well below the industry average.

Peterson died unexpectedly after a heart attack in May 1984. The board began to search for a replacement. Having narrowed the search to three final candidates, the board engaged Jerry Findley, an outside bank consultant, to make recommendations for the President/CEO position and to assess the bank's condition. Findley recommended Michael Jones for the position, but also identified many serious problems with the bank, including a too-rapid growth rate, unreliable sources of funding, liquidity problems, and insufficient equity capital.

A few weeks after Jones became President and CEO, federal regulators examined the bank. They reported many problems that Findley had predicted they would, including the bank's rapid loan growth, the quality of the loan portfolio, and an inadequate capital base.

In response to Findley's and the regulators' reports, the board requested that Jones develop and implement a "Credit Quality Action Plan." This included implementing better procedures for billing, reporting delinquency data, and tracking the performances of loan officers. The board retained an outside consultant to improve the bank's loan guidelines. The board also hired consultants to audit the auto loan underwriting files, but the consultants determined that the portfolio was not "seasoned enough to fully rate." During the fall of 1984, the directors regularly attended board meetings and committees of the board were active.

In December 1984, the OCC issued a cease and desist order. The OCC directed the board to take specific actions and set goals and dates by which the board needed to comply with the order. The order did not require the bank to stop making indirect auto loans. The directors took various steps to address these concerns, including inquiring in more detail about the bank's operations, firing and replacing Frances Cragen, and hiring a national accounting firm to ascertain and certify loan values and loan loss reserves.

In April 1985, the OCC reported that although significant progress had been made toward compliance with the cease and desist order and that supervision and management had improved, the bank's condition remained unsatisfactory. The OCC's biggest concern was the bank's inadequate capitalization. Specifically, the OCC found that primary capital should be, at a minimum, seven percent of the bank's total assets. The bank's primary capital was three and eight-tenths percent of the bank's total assets. The OCC also noted that the bank's problems were due largely to the singular control formerly exercised by Peterson.

In June 1985, the OCC reported that although supervision and management of the bank had substantially improved and were generally satisfactory, the bank had yet to comply with the cease and desist order. The OCC noted that asset quality remained poor and that management had failed to reach standards for recognition of installment loan losses.

The bank continued to experience serious difficulty throughout 1986 and 1987. In 1987, the board learned that the reports of the national accounting firm, which had

stated that the bank's loan loss reserves were adequate, were invalid. In July 1987, the OCC reported that management and inadequate capital were the two most critical issues facing the bank, but that poor asset quality and violations of lending limits also remained problems. The OCC called the board's supervision of the bank "inexcusable," explaining that the bank's condition was critical and the board had allowed the bank to violate legal lending limits and allowed the bank's staff to dwindle. To address the lack of capital, board members personally contributed over $2.8 million in an attempt to save the bank.

In early 1988, the OCC determined that the bank was insolvent and ordered it closed. The Federal Deposit Insurance Corporation ("FDIC") eventually seized the bank, was appointed receiver, and instituted this lawsuit against the directors. The FDIC contended that the directors were negligent in the performance of their directorial duties and should be personally liable for the losses in the bank's portfolio.

The suit proceeded to trial, in which the jury reached a verdict for the FDIC. The district court granted the directors' motion for judgment as a matter of law, and in the alternative, for a new trial. This court reversed the district court's grant of judgment as a matter of law, but affirmed the district court's grant of a new trial. On remand, the district court granted the directors' motion for summary judgment. The FDIC timely appeals.

## II

Resolution of this appeal rests on the extent to which the California business judgment rule immunizes directors of federally-insured national banks from liability for purely negligent acts. The FDIC does not contend that the directors were guilty of gross negligence or other malfeasance. As the district court described the FDIC's case theory:

The FDIC does not challenge any banking activities or operations other than the automobile loans. Furthermore, sub judice, the FDIC makes no claims of self-interest, insider dealing or loans, conflict of interest, fraud, or gross negligence. It has been the FDIC's position from the beginning that this case should be tried on a simple negligence theory.

### A

Although the defendants are directors of a federally-insured national bank, their liability is determined by California state law. *See* 12 U.S.C.A. § 1821(k) (West Supp.1999); *Atherton v. FDIC*, 519 U.S. 213, 215–16, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *FDIC v. McSweeney*, 976 F.2d 532, 541 (9th Cir.1992). The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") provides that directors and officers of insured depository institutions may be held liable for money damages brought by the FDIC for "gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law." 12 U.S.C. § 1821(k). In *Atherton*, the Supreme Court construed FIRREA's requirements and held that "state law sets the standard of conduct as long as the state standard (such as simple negligence) is stricter than that of the federal statute. The federal statute nonetheless sets a 'gross negligence' floor, which applies as a substitute for state standards that are more relaxed." 519 U.S. at 216, 117 S.Ct. 666.

California's business judgment rule, discussed *infra*, requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would. It immunizes directors from liability if they can establish that they acted in accordance with this standard of care. It further provides that directors are entitled, as a matter of law, to rely on certain information. In this instance, the FDIC alleges that the directors were guilty of ordinary negligence. The directors assert the defense of statutory immunity under California's business judgment rule. Because the simple negli-

gence standard is stricter than the gross negligence standard provided for in 12 U.S.C. § 1821(k) and because the immunity defense does not implicate the "floor" of gross negligence under the facts of this case, California law is the applicable standard for assessing liability in this instance under *Atherton.*

■ California Corporations Code § 309 codifies California's business judgment rule. *See Gaillard v. Natomas Co.,* 208 Cal.App.3d 1250, 256 Cal.Rptr. 702, 705 (1989). The general purpose of the business judgment rule is to afford directors broad discretion in making corporate decisions and to allow these decisions to be made without judicial second-guessing in hindsight. *See Barnes v. State Farm Mut. Auto. Ins. Co.,* 16 Cal.App.4th 365, 20 Cal. Rptr.2d 87, 95 (1993). As codified, the California business judgment rule first explains the standard of care under which a director must perform her duties:

> A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

Cal. Corp.Code § 309(a) (West 1998).

Directors are permitted to rely upon certain information prepared by others. As the statute provides:

> In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:
> (1) One or more officers or employees of the corporation whom the director be-

lieves to be reliable and competent in the matters presented.
> (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence.
> (3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence,
> so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

*Id.* § 309(b).

Last, § 309 shields from liability directors who follow these provisions:

> A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director.

*Id.* § 309(c).

[4] These sections codify California's business judgment rule defense. The California business judgment rule is intended to protect a director from liability for " 'a mistake in business judgment which is made in good faith and in what he or she believes to be the best interest of the corporation, where no conflict of interest exists.' " *Barnes,* 20 Cal.Rptr.2d at 95 (quoting *Gaillard,* 256 Cal.Rptr. at 710). It requires directors to act in good faith and with the prudence that an ordinary person would under like circumstances. However, it also entitles a director to rely on information supplied by others. If directors meet the requirements of the business judgment rule, they are entitled to immunity from personal liability for acts of ordinary negligence under California law. *See Lee v. Interins. Exch.,* 50 Cal.App.4th 694, 57 Cal.Rptr.2d 798, 810 (1997).[2]

---

2. The questions of (1) whether California recognizes a gross negligence exception to this immunity and (2) whether a blanket immunity that included acts of gross negligence might

violate the "gross negligence floor" of 12 U.S.C. § 1821(k) as construed under *Atherton* are not at issue in this case because the FDIC

## B

■ In this case, the FDIC claims that the directors are not entitled to the protection of the business judgment rule because they negligently failed to investigate and inform themselves of the bank's financial condition. Yet California specifically eschewed a duty of inquiry "such as the duty imposed by Section 11 of the United States Securities Act of 1933." Cal. Corp.Code § 309 Legislative Committee Comment (1975). Rather, California allows non-officer directors to rely upon company employees and advisors without a duty of further inquiry absent special circumstances. *See Gaillard,* 256 Cal.Rptr. at 711. Under California law, a "prima facie showing of good faith and reasonable investigation is established when a majority of the board is comprised of outside directors and the board" has received the advice of independent consultants. *Katz v. Chevron Corp.,* 22 Cal.App.4th 1352, 27 Cal.Rptr.2d 681, 690 (1994).

Thus, the FDIC has misapprehended the structure of the California business judgment rule: it would impose liability for negligence in obtaining and acting upon information provided by independent consultants. Plainly, the statute specifically allows directors acting in good faith to rely upon such information without liability for doing so. Of course, the directors must establish they acted in · good faith and make a prima facie showing of a reasonable investigation in order to rely on the defense. However, if they have done so without rebuttal, and if they relied on the type of information identified in § 309(b), they are entitled to immunity from claims of ordinary negligence.

■ Here, the defendant directors established a prima facie showing of a reasonable investigation. A majority of the board consisted of outside directors and it is undisputed that the board sought and obtained the advice of a number of outside expert consultants.

To rebut the prima facie showing of reasonable investigation, the FDIC offers only generic challenges to the adequacy of the directors' inquiry. The FDIC does not dispute that the directors requested and received "information, opinions, reports or statements, including financial statements and other financial data." Cal. Corp.Code § 309(b). Indeed, the FDIC expert testified that the directors were "surrounded by sources of information." Rather, the crux of the FDIC case consisted of largely ad hominem attacks on the directors' capabilities, their decisions, and their "inability to reverse negative earnings trends." The FDIC argues that the directors did not comprehend, or act appropriately upon, the information they received and that they "failed to understand their core business, indirect auto lending." In support, the FDIC challenges a number of board actions, such as continuing auto lending and management selection, and claims that the board failed to adopt proper policies concerning loans, capital adequacy, collections, and internal controls. However, these allegations are irrelevant to the rebuttal of a prima facie showing of adequate investigation; rather, they bear on the soundness of the directors' actions based on the information.[3]

Thus, the undisputed facts show that the defendant directors received "information, opinions, reports or statements, including financial statements and other financial data" from a variety of sources, including consultant Findley, bank regulators, and a national accounting firm. The FDIC failed to rebut the prima facie showing of reasonable investigation. Therefore, the directors were entitled to the protection of the business judgment rule.

does not claim that the directors were guilty of gross negligence.

**3.** We shall not detail the district court's exhaustive analysis, with which we agree, of the specific FDIC charges; it suffices to say that they all may be categorized as challenges to the directors' decisions.

 This is not to say that directors of California corporations may immunize themselves simply by acquiring information. It is clear that the rule does not protect a director in certain situations, such as where there is a conflict of interest, fraud, oppression, or corruption. *See Barnes,* 20 Cal.Rptr.2d at 95. Neither does the business judgment rule protect a director who has wholly abdicated his corporate responsibility, closing his or her eyes to corporate affairs. *See Gaillard,* 256 Cal.Rptr. at 710. But the rule does protect well-meaning directors who are misinformed, misguided, and honestly mistaken. Contrary to the implications made by the FDIC, the Corporations Code does not impose on directors a duty of possessing specialized knowledge.[4] Rather, directors are charged with a duty of "good faith" and conducting business "in a manner such director believes to be in the best interests of the corporation and its shareholders." Cal. Corp.Code § 309(a).

### C

 In this case, there is no dispute that the directors acted in good faith and with the belief that their actions were in the best interests of the corporation. The directors were initially misguided by the analysis of former President Peterson, who had over a quarter century of experience as a bank regulator. They were further misguided by an analysis of a national accounting firm. They attempted to follow the advice of several consultants, and invested-and lost-substantial sums of their own money. Despite these efforts, they were unable to avert the bank's collapse. The undisputed record indicates that the directors were entitled to the protection of the business judgment rule. Accordingly, the defendant directors cannot, as a matter of law, be held liable for solely negligent acts. The district court properly granted summary judgment.[5]

AFFIRMED

---

4. Indeed, in the national banking context, directors may well be chosen not solely for their business acumen, but for their relationship to the borrowing community. The Community Reinvestment Act of 1977 ("CRA") requires financial institutions to "help meet the credit needs of the local communities in which they are chartered." 12 U.S.C.A. § 2901(a)(3) (West Supp.1999). To that end, the CRA encourages lending to segments of the community that otherwise might not have easy credit access, such as "low and moderate income neighborhoods." 12 U.S.C.A. § 2903(a)(1) (West Supp.1999). In furtherance of those goals, many banks include on their boards persons representative of their lending community, some of whom may lack an extensive knowledge of banking procedure, but whose contributions to the board are nonetheless valuable because of their knowledge of community needs. A requirement of encyclopedic bank knowledge as a pre-requisite to board service would thwart the purpose of the CRA, as would imposing personal liability for lack of such specialized knowledge.

5. We decline to reach the FDIC's other contentions, because the FDIC raises them for the first time on appeal. *See Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1321 (9th Cir.1998).