Filed 7/14/16 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PALM SPRINGS VILLAS II HOMEOWNERS ASSOCIATION, INC., <br><br> Cross-complainant and Appellant, <br><br> v. <br><br> ERNA PARTH, <br><br> Cross-defendant and Respondent. | D068731 <br><br> (Super. Ct. No. INC1202588) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed June 21, 2016 is modified as follows:

1.      On page 5, the first full sentence is removed and replaced with the

following sentence:

"Parth then found a roofing company on her own, without consulting either the
Board or AWS."

2.      On page 21, the third and fourth sentences in the second paragraph are

removed and replaced with the following sentences:

"The Association also established that Parth found a roofing contractor without any formal bid or contract, that the Board hired Bonded Roofing but paid Warren Roofing, that Warren Roofing may have significantly overcharged the Association for the work performed, and that this work was defective and required repair.[7] This evidence is sufficient to raise an issue as to Parth's diligence with respect to the investigation and payment of the roofers."

This replacement has no impact on footnote 7.

**THERE IS NO CHANGE IN JUDGMENT.**

The petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to: All parties

2

Filed 6/21/16 (unmodified version)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PALM SPRINGS VILLAS II HOMEOWNERS ASSOCIATION, INC., | D068731 |
| Cross-complainant and Appellant, | |
| v. | (Super. Ct. No. INC1202588) |
| ERNA PARTH, | |
| Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Riverside County, John G.

Evans, Judge.  Reversed in part, affirmed in part.


Epsten Grinnell & Howell, Anne L. Rauch and Joyce J. Kapsal for

Cross-complainant and Appellant.

Kulik Gottesman & Siegel, Leonard Siegel, Thomas M. Ware II and Francesca N.

Dioguardi for Cross-defendant and Respondent.

# I

# INTRODUCTION

The Palm Springs Villas II Homeowners Association, Inc. (Association) appeals from a judgment entered in favor of Erna Parth, in connection with actions she took while simultaneously serving as president of the Association and on its Board of Directors (Board). The court granted Parth's motion for summary judgment as to the Association's claim for breach of fiduciary duty on the basis of the business judgment rule and an exculpatory provision contained in the Association's Declaration of Covenants, Conditions, and Restrictions (CC&Rs). The court had previously sustained Parth's demurrer to the Association's claim for breach of governing documents without leave to amend, finding that the Association failed to allege a cognizable breach.

On appeal, the Association argues that the trial court erred in its application of the business judgment rule and that there remain material issues of fact in dispute regarding whether Parth exercised reasonable diligence. We agree that the record discloses triable issues of fact that should not have been resolved on summary judgment. We therefore reverse the judgment in favor of Parth. The Association also contends that it stated a claim for breach of the governing documents and that the court erred in sustaining Parth's demurrer. We conclude that the document cause of action is, at best, duplicative of the fiduciary breach cause and affirm the ruling sustaining the demurrer as to that cause of action without leave to amend.

## II

## FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *Background on Palm Springs Villas II and its governance*

The Association is the governing body for Palm Springs Villas II, a condominium development, and is organized as a nonprofit corporation under California law. The Board, comprised of five homeowners or their agents, governs the Association. The Association's governing documents include the CC&Rs and its Bylaws. Each homeowner is an Association member and is required to comply with the terms set forth in these documents.

Certain provisions reserve to the Board the authority to take particular actions. Article VI, Section 3, of the CC&Rs provides that the Board "shall have authority to conduct all business affairs of common interest to all Owners." Article VI, Section 1, of the Bylaws describes the Board's powers, including to "contract . . . for maintenance, . . . and services" and to "borrow money and incur indebtedness . . . provided, however, that no property of the association shall be encumbered as security for any such debt except under the vote of the majority of the members entitled to vote. . . ."

Other provisions limit the Board's power and retain authority for the members.

---

1      We rely on the facts that the parties set forth in their separate statements in the trial court and the evidence cited therein, as well as other evidence submitted with the parties' papers below. (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 303, fn. 1.) However, we do not rely on evidence to which objections were sustained. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176.)

3

Article VI, Section 1, of the Bylaws explains that "[n]otwithstanding the foregoing, the Board shall not, except with the vote or written assent of a majority of the unit owners . . . [e]nter into a contract with a third person wherein the third person will furnish goods or services for the common area or the association for a term longer than one year . . . ." Article XVI, Section 2, of the CC&Rs, provides that "[n]otwithstanding any other provisions of this Declaration or the Bylaws, the prior written approval of at least two-thirds (2/3) of the . . . Owners . . . shall be required" for actions including "the . . . encumbrance, . . . whether by act or omission, of the Common Area . . . ."

The CC&Rs also contain an exculpatory provision. Article VI, Section 16, provides: "No member of the Board . . . shall be personally liable to any Owner, or to any other party, including the Association, for any damage, loss or prejudice of the Association, the Board, the Manager or any other representative or employee of the Association, or any committee, or any officer of the Association, provided that such person has, upon the basis of such information as may be possessed by him, acted in good faith, and without willful or intentional misconduct."

During the relevant time, Parth was president of the Association, as well as a Board member.

B.     *Events leading to breach allegations*

1.     *Roofing repairs*

In 2006, the Board hired AWS Roofing and Waterproofing Consultants (AWS) in connection with roofing repairs, with the intention that AWS would vet the companies submitting bids and perform other tasks related to the repairs. According to Parth, AWS

4

prepared a budget estimate for the repairs, the Board submitted a request to the members for a special assessment to offset these costs, and the members voted against the request. Parth then found and retained a roofing company on her own, without consulting either the Board or AWS.

Parth indicated that she tried to contact the roofing company that had previously worked on the roofs, but it was no longer in business, and that she could not find another roofer due to the Association's financial condition. She obtained the telephone number for a company called Warren Roofing from a contractor that was working on a unit. The record reflects that the person Parth contacted was Gene Layton. At his deposition, Layton stated that he held a contractor's license for a company called Bonded Roofing and that he had a relationship with Warren Roofing, which held a roofing license. When asked about that relationship, Layton explained that on a large project, he would be the project manager.

At Parth's deposition, Association counsel asked Parth if she had investigated whether Warren Roofing had a valid license. She replied, "[h]e does and did and bonded and insured." Counsel clarified "[t]here's a Bonded Roofing and Warren Roofing. Who did you hire?" Parth responded "One Roofing. That's all one company, I think." Counsel then asked if she had "investigate[d] whether Bonded Roofing was licensed," and Parth answered, "I did not investigate anything."

According to a June 2007 Board resolution, the Board hired Bonded Roofing to work on a time and materials basis. Layton said that he never met with the Board in a formal meeting or submitted a bid for the work before he started work on the roof. The

5

Association had no records of a written contract with Bonded Roofing or any other roofer.

Warren Roofing submitted invoices and was ultimately paid more than $1.19 million for the work. Many of the checks were signed by Parth. Layton stated that "Bonded Roofing had nothing to do with the money on this job" and that he was paid by Warren Roofing. Board member Tom Thomas indicated that no invoices from Warren Roofing were included in the packets provided to the Board members each month, and Board member Robert Michael likewise did not recall having seen the invoices. Parth explained that she relied on Board member and treasurer Robert ApRoberts, a retired certified public accountant, to review invoices. Larry Gliko, the Association's contracting expert, opined that the invoices submitted by Warren Roofing were "not at all characteristic" of those typically used in the building industry or submitted to homeowners' associations, included amounts that Gliko viewed as unnecessary, and charged the Association "almost double" what the work should have cost. Gliko also opined that "the work performed by Warren Roofing [was] deficient," "fell far below the standard of care," and "require[d] significant repairs."

2.    *Repaving projects and loans*

In April 2007, the Board voted to hire a construction company to repair the walkways. The Board asked the membership to vote on a special assessment to fund this and other repairs. The membership voted to approve the special assessment.

In July 2007, Parth signed promissory notes for $900,000 and $325,000, secured by the Association's assets and property. She stated that at the time the special

6

assessment was approved, the Board was investigating the possibility of obtaining a loan to raise the capital needed to immediately commence work on the walkway project. Thomas indicated that, as an Association member, he was never asked to approve the debt and did not learn about it until this litigation commenced. The Association had no records indicating that the members were ever informed about, or voted on, the debt.

In April 2010, the Board approved a bid from a paving company to perform repaving work. According to Parth, the Board elected to finance this repaving project with a bank loan, the Board reviewed the loan at the April 2010 meeting, and "unanimously approved" that Parth and/or ApRoberts would sign the loan documents. Parth further stated that at a special Board meeting in May 2010, attended by her, ApRoberts, and Board member Elvira Kitt-Kellam, the Board "resolved that the Association had the power to borrow and pledge collateral" and authorized her and ApRoberts to execute loan documents. Thomas stated that he never received notice of this meeting. In May 2010, Parth and ApRoberts signed a promissory note for $550,000, secured by the Association's accounts receivable and assets. Thomas indicated that he was never asked to vote on this debt and, again, there were no Association records indicating that the members were notified about or voted on it.

In construction and business loan agreements in connection with the 2007 and 2010 notes, Parth and ApRoberts represented that the agreements were "duly authorized by all necessary action by [the Association]" and did not conflict with the Association's organizational documents or bylaws. Parth testified at her deposition that she had not reviewed the CC&Rs or Bylaws regarding her authority to execute a promissory note and

7

did not know whether she had such authority under the CC&Rs. In her declaration in support of summary judgment, Parth explained that she believed she "had authority to borrow money and execute loan documents on behalf of the Association in [her] capacity as president," and was "unaware that a vote of the majority of the members was required in order to pledge the Association's assets as security for the loan." She also indicated that "no one advised [her] that she did not have authority to sign the loan documents . . . or that a vote of the membership was required."

3. *Jesse's Landscaping*

At a December 2010 Board executive meeting attended by Parth, Michael, and Kitt-Kellam, those Board members approved and signed a five-year contract with Jesse's Landscaping. Thomas indicated that he was not given notice of the meeting. At her deposition, in response to a question regarding whether she had the authority to sign a five-year contract, Parth answered, "I don't know." During the same line of questioning, Parth also acknowledged that her "understanding of what [her] authority is under the bylaws" was "[n]one."

4. *Termination of Personalized Property Management*

During the relevant time period, the Association's management company was Personalized Property Management (PPM). According to Parth, PPM's owner advised her in or around June or July 2011 that PPM no longer wanted to provide management services for the Association. At a July 9, 2011 Board meeting regarding termination of PPM, the Board tabled any decision to terminate PPM until bids from other companies were obtained and reviewed. Parth proceeded to hire the Lyttleton Company to serve as

8

the Association's new management company. Thomas stated that he never received written notice of a Board meeting to vote on the hiring of Lyttleton. Parth noticed an executive meeting for July 16, 2011, to discuss termination of PPM and retention of a new company, at which time the Board voted three to two to terminate PPM. Thomas stated that he objected to the vote at the time, based on the Board's prior decision to table the matter.

5. *Desert Protection Security Services contract*

Gary Drawert, doing business as Desert Protection Security Services (Desert Protection), had provided security services for Palm Springs Villas II since 2004. The Association executed a written contract with Desert Protection in December 2003 for one year of security services. Thomas stated that after joining the Board, he learned that Desert Protection and other vendors were providing services pursuant to "oral or month-to-month agreements." In July 2010, the Board authorized Thomas to obtain bids from security companies to provide security services for 2011.

In January 2011, Parth signed a one-year contract with Desert Protection. Her understanding was that "any contract that was not renewed in writing would . . . be automatically renewed until terminated" and that she was "merely updating the contract, as instructed by management."[2] She believed that she had the "authority to sign the contract as the Association's president." She further explained that, at the time, the Board

_____

[2] Although Parth's statement that she *believed* that she had been instructed by management to enter into the contract with Desert Protection is in the record, the trial court sustained an objection to her declaration statement that she was told that the contract "needed to be updated and was ready to be signed."

9

had not voted to terminate Desert Protection and discussions regarding a new security company had been tabled.

There were no records indicating that Parth submitted the 2011 Desert Protection agreement to the Board for review or that the Board authorized her to execute it. According to Thomas, Parth did not inform the other Board members that she had signed the agreement. Michael likewise indicated that he had not attended any Board meeting at which the agreement was discussed, and he did not recall the Board having voted on it. Kitt-Kellam stated that the Board never authorized the contract.

In February 2011, the Association's manager sent Parth and others an e-mail recommending that the Board update certain contracts, including the contract with Desert Protection. Thomas presented the security company bids at a March 2011 Board meeting. The Board tabled the discussion at this meeting and at the subsequent April 2011 meeting. At the July 2011 meeting, the Board approved a proposal from Securitas in a three-to-one vote, with Parth abstaining. According to Thomas, Parth did not disclose at any of these meetings that she had signed a one-year contract with Desert Protection in January 2011. Following the July 2011 Board meeting, Desert Protection was sent a 30-day termination letter, based on the Board's understanding that the company was operating on a month-to-month basis.

In August 2011, Gary Drawert, the principal of Desert Protection, left a voice mail message for Thomas regarding the Desert Protection agreement. Thomas indicated that prior to this voice mail, he was not aware of the agreement. At the September 2011 Board meeting, Parth produced the Desert Protection agreement. The Board did not

10

ratify it.

C.      *Desert Protection sues and the Association files a cross-complaint*

Drawert sued the Association for breach of contract.  The Association cross-complained against Desert Protection and Parth.  Following an initial demurrer, the Association filed the operative First Amended Cross-Complaint.  The Association settled with Drawert.

With respect to Parth, the Association asserted causes of action for breach of fiduciary duty and breach of governing documents.  The cause of action for breach of fiduciary duty alleged that Parth had breached her duties to comply with the governing documents and to avoid causing harm to the Association by, among other things, refusing to submit bids or contracts to the Board, "unilaterally terminating" PPM, and signing the contract with Desert Protection.  The breach of governing documents cause of action identified CC&R and Bylaw provisions and identified actions taken by Parth in breach of these provisions, including the termination of PPM and entering into the Desert Protection contract.

Parth demurred to the First Amended Cross-Complaint.  With respect to the governing documents claim, she contended that the claim failed to state a cause of action and was uncertain.  The court sustained the demurrer without leave to amend as to this cause of action.  We discuss this ruling in more detail, *post*.

Parth moved for summary judgment, contending that the claim of breach of fiduciary duty was barred by the business judgment rule and by the exculpatory provision in the CC&Rs.  The trial court granted the motion.  In doing so, the court described the

11

business judgment rule (including the requirement that directors "act[] on an informed basis") and observed that courts will not hold directors liable for errors in judgment, as long as the directors were: "(1) disinterested and independent; (2) acting in good faith; and (3) reasonably diligent in informing themselves of the facts." The court further noted that the plaintiff has the burden of demonstrating, among other things, that "the decision . . . was made in bad faith (e.g., fraudulently) or without the requisite degree of care and diligence."[3]

The court found that Parth had set forth sufficient evidence that she was "disinterested," and that she had "acted in good faith and without willful or intentional misconduct," and "upon the basis of such information as she possessed." The burden shifted to the Association to establish a triable issue of material fact and the court found that the Association failed to satisfy this burden. As to bad faith, the court found that there was a triable issue as to whether Parth had violated the governing documents, but that such a violation would be insufficient to overcome the business judgment rule or the exculpatory provision of the CC&Rs. With respect to diligence, the court found no evidence that Parth "did not use reasonable diligence in ascertaining the facts."

---

[3] The trial court also stated that the "business judgment rule standard is one of gross negligence—i.e., failure to exercise even slight care," citing *Katz v. Chevron* (1994) 22 Cal.App.4th 1352. The court did not explain how this standard relates to the components of the business judgment rule. The parties likewise cite the concept without such analysis. Given that *Katz* relies on Delaware law for this standard and the issues before us can be resolved according to the standard of reasonable diligence under California law, we will not focus on gross negligence in our analysis. However, the facts that raise a triable issue as to Parth's diligence, discussed *post*, would also raise an issue as to whether she exercised "even slight care."

According to the court, the "gravamen of the [Association's] claims is . . . that Parth repeatedly acted outside the scope of her authority," and that "[t]he problem with this argument is that Parth believed in her authority to act and the need to act, and the [Association] [fails to] offer any evidence to the contrary, except to say that Parth's actions violated the . . . CC&Rs."

The trial court also ruled on the Association's evidentiary objections; the parties do not indicate whether the court ruled on Parth's objections. The court entered judgment for Parth and the Association timely appealed.

III

DISCUSSION

A. *Motion for summary judgment*

The Association claims that the trial court erred in granting Parth's motion for summary judgment.

1. *Governing law*

A defendant moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) To meet this burden, the defendant must show that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid.*) Once the defendant satisfies its burden, " 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Id.* at p. 849.) "Because a summary judgment

13

denies the adversary party a trial, it should be granted with caution."  (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305.)

We review a trial court's grant of summary judgment de novo.  (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60.)  "[W]e must assume the role of the trial court and redetermine the merits of the motion.  In doing so, we must strictly scrutinize the moving party's papers.  [Citation.]  The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact.  All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment."  (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562.)[4]

2.    *Application*

a.    *Principles governing decisionmaking by a director*

"The common law 'business judgment rule' refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions . . . .  Under this rule, a director is not liable for a mistake in business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation, where no conflict of interest exists."  (*Gaillard v.*

---

[4]    Contrary to Parth's claim, a summary judgment is not "entitled to a presumption of correctness."  The cases on which she relies simply confirm the general principle that an appellant must establish error on appeal.  (See, e.g., *Denham v. The Superior Court of Los Angeles County* (*Marsh & Kidder*) (1970) 2 Cal.3d 557, 564 ["[E]rror must be affirmatively shown."]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in [appellants'] brief."].)

14

*Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263 (*Gaillard*); see *Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 123 (*Ritter*) [business judgment rule "sets up a presumption that directors' decisions are based on sound business judgment"].)

In California, there is a statutory business judgment rule. Corporations Code section 7231 applies to nonprofit corporations and provides that "[a] director shall perform the duties of a director, . . . , in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (§ 7231, subd. (a); see *Ritter*, *supra*, 166 Cal.App.4th at p. 123.) The statute goes on to state that "[a] person who performs the duties of a director in accordance [with the preceding subdivisions] . . . shall have no liability based upon any alleged failure to discharge the person's obligations as a director . . . ." (§ 7231, subd. (c); see *Ritter*, at p. 123; see also § 7231.5, subd. (a) [limiting liability on the same grounds for volunteer directors and officers].)[5]

"Notwithstanding the deference to a director's business judgment, the rule does not immunize a director from liability in the case of his or her abdication of corporate responsibilities." (*Gaillard*, *supra*, 208 Cal.App.3d at p. 1263.) " 'The question is frequently asked, how does the operation of the so-called 'business judgment rule' tie in with the concept of negligence? There is no conflict between the two. When courts say

_____

5     All further statutory references are to the Corporations Code unless otherwise indicated.

15

that they will not interfere in matters of business judgment, it is presupposed that judgment—reasonable diligence—has in fact been exercised.  A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment.' "  (*Burt v. Irvine Co.* (1965) 237 Cal.App.2d 828, 852-853 (*Burt*); *Gaillard*, *supra*, at pp. 1263-1264 [accord].)

Put differently, whether a director exercised reasonable diligence is one of the "factual prerequisites" to application of the business judgment rule.  (*Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930, 941 (*Affan*); *id.* at p. 943 [finding a homeowners association "failed to establish the factual prerequisites for applying the rule of judicial deference" at trial, where "there was no evidence the board engaged in 'reasonable investigation' (citation) before choosing to continue its 'piecemeal' approach to sewage backups"]; see §§ 7231, subd. (a), 7231.5, subd. (a); see also *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 253 (*Lamden*) [requiring "reasonable investigation" for judicial deference]; *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 432 (*Everest*) [accord].)

b.      *The business judgment rule on summary judgment*

The business judgment rule "raises various issues of fact," including whether "a director acted as an ordinarily prudent person under similar circumstances" and "made a reasonable inquiry as indicated by the circumstances."  (*Gaillard*, *supra*, 208 Cal.App.3d at p. 1267.)  "Such questions generally should be left to a trier of fact," but can become questions of law "where the evidence establishes there is no controverted material fact."  (*Id*. at pp. 1267-1268.)  "The function of the trial court in ruling on [a] motion[] for

16

summary judgment [is] merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.] Our function is the same as that of the trial court." (*Id*. at p. 1268; see *id*. at p. 1271 [identifying a triable issue of fact as to whether it was reasonable for the directors on the compensation committee to rely on outside counsel "with no further inquiry," and observing that "[a] trier of fact could reasonably find that the circumstances warranted a thorough review of the golden parachute agreements"]; *id.* at pp. 1271-1272 [noting a "triable issue of fact as to whether *some* further inquiry" was warranted by the other directors regarding the golden parachutes, under the circumstances, notwithstanding that they were entitled to rely on the recommendation of the compensation committee].)[6] (Cf. *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 822 [affirming summary judgment in dispute over attic space use where undisputed evidence showed the board, upon "reasonable investigation" and in good faith "properly exercised its discretion within the scope of the CC&R's . . . ."].)

c.     *The trial court erred in granting summary judgment*

The Association raises two challenges to the summary judgment ruling: that the trial court erred by applying the business judgment rule to Parth's ultra vires acts (or

---

6     (See *Everest*, *supra*, 114 Cal.App.4th at p. 430 [finding that triable issues of fact as to the existence of improper motives and a conflict of interest "preclude[d] summary judgment based on the business judgment rule"]; *Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033, 1044 ["Will submitted evidence that . . . the committee members never reviewed the complaint, the financial records of the corporation, or made any investigation into the matter at all. Company, of course, disputes these allegations. But it is precisely because the issues are disputed that it was error for the trial court to resolve the issues . . . ."].)

17

conduct otherwise outside Parth's authority) and that there are triable issues of material fact as to whether Parth exercised reasonable diligence.

i. *Ultra vires conduct*

The Association has not established that Parth's conduct was ultra vires. Ultra vires conduct is conduct that is beyond the power of the corporation, not an individual director. (See *McDermott v. Bear Film Co.* (1963) 219 Cal.App.2d 607, 610-611 ["In its true sense the phrase ultra vires describes action which is beyond the purpose or power of the corporation."]; *Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 ["If, however, the director's act was within the corporate powers, but was performed without authority or in an unauthorized manner, the act is not ultra vires."].) The Association does not distinguish these authorities, nor does it identify conduct by Parth that went beyond the power of the Association.

However, the Association does cite cases suggesting that noncompliance with governing documents may fall outside the scope of the business judgment rule, at least in certain circumstances. (See *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 374 (*Nahrstedt*) [finding "courts will uphold decisions made by the governing board of an owners association," where among other things, they "are consistent with the development's governing documents"]; *Lamden*, *supra*, 21 Cal.4th at p. 253 [requiring that association board "exercise[] discretion within the scope of its authority under relevant statutes, covenants and restrictions" in order to merit judicial deference]; *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 979 [accord]; *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 388 [finding

18

a "board's decision is not scrutinized under the business judgment rule . . . until after the court determines that the action . . . falls with the discretionary range of action authorized by the contract"].)  See also *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1123 ("Even if the Board was acting in good faith . . . , its policy . . . was not in accord with the CC&Rs. . . .  The Board's interpretation of the CC&Rs was inconsistent with the plain meaning of the document and thus not entitled to judicial deference.").

Parth contends that the business judgment rule protects a director who violates governing documents, as long as the director believes that the actions are in the best interests of the corporation.  She relies on *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125 (*Biren*).  *Biren*, which involved a dispute between a company and a former director, held that the "business judgment rule may protect a director who acts in a mistaken but good faith belief on behalf of the corporation without obtaining the requisite shareholder approval."  The *Biren* court determined that the director in question was protected by the rule, even though she violated the shareholder agreement.  (*Id.* at pp. 131-132.)  However, the court did not suggest that such conduct would always be protected.  Rather, the court concluded that the violation "did not by itself make the business judgment rule inapplicable," explaining that the company failed to prove that the director had "intentionally usurped her authority" or that "her actions were anything more than an honest mistake."  (*Id.* at p. 137.)  The court also noted the trial court's "finding that [the director] 'reasonably relied' on information she believed to be correct," observing that this was "tantamount to a finding she acted in good faith."  (*Id.*

at p. 136.)  In other words, *Biren* held that the director's violation of the governing documents did not render the business judgment rule inapplicable *under the circumstances*; namely, where the remainder of the business judgment rule requirements were satisfied.

Here, the trial court agreed that there was a triable issue of material fact as to whether Parth breached the governing documents, but concluded that even if she had, this was insufficient to overcome the protection of the business judgment rule.  However, the case law is clear that conduct contrary to governing documents may fall outside the business judgment rule.  (See, e.g., *Nahrstedt*, *supra*, 8 Cal.4th at p. 374.)  Even if *Biren* establishes an exception to this principle where the director has satisfied the remaining elements of the business judgment rule, in this case, triable issues of material fact exist as to other elements of the rule and render *Biren* inapplicable, at least at this stage.  The trial court erred in assuming that the business judgment rule would apply to Parth's actions that violated the governing documents.

ii.      *Material issues of fact*

Although the trial court properly recognized that a director must act on an informed basis, be reasonably diligent, and exercise care in order to rely on the business judgment rule, the court erred in concluding that the Association failed to demonstrate triable issues of fact with respect to these matters.  (See *Gaillard*, *supra*, 208 Cal.App.3d at pp. 1271-1272, 1274 [reversing summary judgment due to material issues of fact as to whether further inquiry was warranted].)  We conclude that material issues of fact exist as to whether Parth exercised reasonable diligence in connection with the actions at issue.

20

First, with respect to the roofing repairs, Parth explained how she found Warren Roofing and testified at her deposition that Warren Roofing was licensed. However, during the same line of questioning, she displayed ignorance of the relationship between Warren Roofing and Bonded Roofing and admitted that she had not "investigate[d] anything" pertaining to whether Bonded Roofing was licensed. The Association also established that Parth retained a roofing contractor without any formal bid or contract, that the Board retained Bonded Roofing but paid Warren Roofing, that Warren Roofing may have significantly overcharged the Association for the work performed, and that this work was defective and required repair.[7] This evidence is sufficient to raise an issue as to Parth's diligence in investigating, retaining, and paying the roofers. (See *Affan*, *supra*, 189 Cal.App.4th at pp. 941, 943 [business judgment rule did not apply where, among other things, there was no evidence of a reasonable investigation into sewage work].)[8] Parth's reliance on ApRoberts to review invoices does not resolve these issues. (See *Gaillard*, *supra*, 208 Cal.App.3d at p. 1271 [although the directors could rely upon the recommendations of outside counsel and the compensation committee, triable issues

[7]    There also was no evidence of a written warranty for the roofing work. Layton testified at deposition that he provided a warranty, but did not indicate that it was written, and Parth contends only that she obtained a verbal warranty.

[8]    The Association contends that both Warren Roofing and Bonded Roofing were unlicensed at the time the roofing work was done, while Parth maintains that Warren Roofing was licensed. We need not address this dispute. Although the existence of facts that the exercise of proper diligence might have disclosed (such as license status) may be relevant to whether Parth exhibited reasonable diligence (see *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1046), we conclude that her admission that she "did not investigate anything," in the context of a major repair project, is sufficient to raise a triable issue.

existed as to whether further inquiry was still required under the circumstances].)

Second, the 2007 and 2010 promissory notes, secured by Association assets, similarly raise issues as to whether Parth proceeded on an informed basis. She relies on her belief that she had the authority to take out the loans, her lack of awareness that a member vote was required to encumber the assets of the Association, and that no one advised her that she lacked the authority or that membership approval was required. She also states in her declaration that she and two other Board members authorized her and ApRoberts to sign the 2010 note. However, as the Association points out, the governing documents require member approval for such debt and there is no record of such approval. Parth's deposition testimony also reflects that she did not know whether she had the authority under the governing documents to sign the loans, and that she made no effort to determine whether she had such authority. Whether Parth exercised sufficient diligence to inform herself of the Association's requirements pertaining to the loans at issue is a question for the trier of fact. (See *Gaillard*, *supra*, 208 Cal.App.3d at p. 1267; *id.* at p. 1271 [noting triable issue as to whether the "circumstances warranted a thorough review of the . . . agreements"].) Parth "cannot close [her] eyes" to matters as basic as the provisions of the CC&Rs and Bylaws of the Association and at the same time claim that she "exercis[ed] business judgment." (*Id*. at p. 1263.)

Third, as to Jesse's Landscaping, Parth indicated that three Board members, including herself, approved a five-year contract in 2010. However, the Association provided evidence that the governing documents require that a contract with a third party exceeding one year be approved by member vote. In addition, Parth acknowledged at her

22

deposition that she did not know whether she had the authority to sign a five-year contract, and that she had no understanding of what her authority was under the Bylaws. This evidence suggests that Parth may not have understood, nor made any effort to understand, whether the Board was permitted to authorize the Jesse's Landscaping contract without member approval. As with the loans, Parth's admitted lack of effort to inform herself of the extent of her authority in this regard is sufficient to establish a triable issue. (See *Gaillard*, *supra*, 208 Cal.App.3d at pp. 1263, 1267, 1271.)

Fourth, regarding the PPM termination, Parth explained that PPM's owner did not want PPM to be the management company for the Association any longer and that the Board subsequently voted to terminate PPM on July 16, 2011. However, the Association's evidence reflects that the Board had tabled the issue of the termination of PPM on July 9 and that Parth met with and hired Lyttleton Company, apparently without calling a Board meeting to vote on the matter. The timeline of these events is somewhat unclear, including whether Parth hired Lyttleton before the Board voted to terminate PPM, but we will not attempt to resolve such factual issues on summary judgment. Regardless of the timing, the evidence presented as to the matter raises questions as to whether Parth proceeded with reasonable diligence. (See *Gaillard*, *supra*, 208 Cal.App.3d at pp. 1271-1272; *Affan*, *supra*, 189 Cal.App.4th at pp. 941, 943.)

Finally, the Desert Security contract similarly calls into question Parth's diligence. Parth offered several explanations for her execution of the contract with Desert Security in January 2011, despite the Board's decision to consider bids from other companies for

23

security services. Some of her explanations were inconsistent,[9] and the Association's evidence cast doubt on all of them. With respect to Parth's stated belief that she had the authority to sign the contract, the Association provided evidence in other contexts (e.g., the promissory notes) that Parth failed to understand the scope of her authority; this same evidence suggests that she made no effort to ascertain what authority she did possess to conduct the business of the Association. The business judgment rule would not extend to such willful ignorance. (See *Gaillard*, *supra*, 208 Cal.App.3d at p. 1263.) Parth also indicated that at the time she signed the contract, the Board had tabled the security discussion and had not yet terminated Desert Protection. However, the Association provided evidence that Parth failed to bring the new contract to the attention of the Board or alert the Board to its existence, even after the security discussion had been reopened, thus calling into question Parth's explanations. This conduct raises serious questions as to Parth's diligence, particularly given the timing of the relevant events. (*Id*. at p. 1271 [noting the "nature" and "timing" of the agreements at issue].)

Although the trial court declined to address much of the Association's evidence, it did discuss the Desert Protection situation. The court stated that the Association disputed the basis for Parth's belief in her authority to sign the Desert Protection contract by citing the Bylaws, and concluded that this evidence did not controvert Parth's professed belief. While the Bylaws may not undermine Parth's *belief*, together with the Association's other

---

9    For example, Parth indicated both that she believed nonwritten contracts would be automatically renewed and that she was "merely updating" the contract, without explaining why a new or updated contract would be necessary if the existing contract would automatically be renewed.

evidence, they do demonstrate the existence of a triable issue of material fact as to whether Parth's proceeding on such belief—without keeping the Board informed—showed reasonable diligence under the circumstances.

In sum, the Association produced evidence establishing the existence of triable issues of material fact as to whether Parth acted on an informed basis and with reasonable diligence, precluding summary judgment based on the business judgment rule. The trial court's erroneous conclusion that "there [was] no evidence that Parth did not use reasonable diligence" reflects a misapplication of the business judgment rule, summary judgment standards, or both. To the extent that the court viewed the Association's evidence regarding Parth's diligence as irrelevant, in light of her "belief[] in [her] authority to act and the need to act," the court failed to apply the reasonable diligence requirement in any meaningful way. Permitting directors to remain ignorant and to rely on their uninformed beliefs to obtain summary judgment would gut the reasonable diligence element of the rule and, quite possibly, incentivize directors to remain ignorant. To the extent that the trial court did consider the Association's evidence, but found it insufficient to establish a lack of diligence, the court improperly stepped into the role of fact finder and decided the merits of the issue.

In addition, the Association contends that courts treat diligence and good faith as intertwined, citing *Biren's* description of the trial court's finding that the director reasonably relied on information she believed to be correct as "tantamount" to a finding of good faith. (See *Biren*, *supra*, 102 Cal.App.4th at p. 136.) Our own research reveals that other courts similarly have considered diligence as part of the good faith inquiry.

25

(See, e.g., *Affan*, *supra*, 189 Cal.App.4th at p. 943 ["Nor was there evidence the Association acted 'in good faith . . . , because no one testified about the board's *decisionmaking process* . . . . [¶] [I]n *Lamden*, ample evidence demonstrated the association board engaged in the sort of reasoned decisionmaking that merits judicial deference. There is no such showing in the case before us."]; see also *Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 189 ["[T]he court must look into the procedures employed and determine whether they were adequate or whether they were so inadequate as to suggest fraud or bad faith. That is, '[p]roof . . . that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine.' "].) In light of these authorities, we recognize that there may be a triable issue of material fact as to Parth's good faith, as well.[10]

---

[10] The Association also appears to challenge several other actions on the part of Parth, but fails to support its challenge with argument and/or specific authority. These actions include Parth's execution of the Board member Code of Conduct, certain purported violations of the Common Interest Open Meeting Act and Davis-Stirling Common Interest Development Act, and various facts pertaining to bad faith. We deem these matters forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [it is not the reviewing court's role to "construct a theory" for appellant: "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived. . . ."].) In addition, because we conclude that the Association has established the existence of triable issues of material fact as to both the business judgment rule and the exculpatory provision of the CC&Rs, see discussion *post*, we need not reach its arguments under section 5047.5 and

26

iii.     *Parth's contentions*

As a preliminary matter, Parth contends that "[v]irtually all of the evidence proffered in opposition to the motion for summary judgment was inadmissible," but cites only her own evidentiary objections, rather than any ruling by the trial court.  She also does not offer any argument regarding the evidence itself, other than to state generally that evidence without foundation is inadmissible (and, with one exception not relevant here, does not identify any specific evidence).  We conclude that Parth has forfeited these objections.  (*Stanley*, *supra*, 10 Cal.4th at p. 793; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 ["[I]t is counsel's duty to point out portions of the record that support the position taken on appeal . . . ."]; *ibid.* ["[A]ny point raised that lacks citation may, in this court's discretion, be deemed waived."].)

Turning to Parth's substantive arguments, we first address her contention that she displayed no bad faith.  She relies on cases characterizing bad faith as intentional misconduct, encompassing fraud, conflicts of interest, and intent to serve an outside purpose.  (See, e.g., *Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365, 379.)  However, the Association's appeal focuses on Parth's failure to exercise reasonable diligence, so establishing an absence of evidence of intentional misconduct unrelated to diligence does not undermine the Association's arguments.

Next, Parth suggests that the Association's concerns with respect to her lack of diligence in securing a roofing contractor sound in negligence, contending that "a

Civil Code section 5800 or its argument that Parth is estopped from claiming ignorance of the governing documents.

27

director's conduct or decisions are not judged according to a negligence standard." (Boldface omitted.) However, as the authorities discussed *ante* make clear, there is "no conflict" between the business judgment rule and negligence, and application of that rule "presuppose[s] that . . . reasonable diligence [] has in fact been exercised." (*Gaillard*, *supra*, 208 Cal.App.3d at pp. 1263-1264, quoting *Burt*, *supra*, 237 Cal.App.2d at pp. 852-853; *Affan*, *supra*, 189 Cal.App.4th at p. 941.)

Parth's reliance on the exculpatory clause of the Association's CC&Rs is similarly unpersuasive. She contends that even if she exceeded her authority, the "only condition for the stated contractual immunity is that the board members perform their duties in 'good faith, and without willful or intentional misconduct.' " However, she fails to address the immediately preceding clause, which requires that the director act "upon the basis of such information as may be possessed by [her]." This language is arguably analogous to the business judgment rule's reasonable diligence requirement. (*Gaillard*, *supra*, 208 Cal.App.3d at pp. 1263-1264.) At minimum, even if the exculpatory provision did not obligate Parth to obtain additional information regarding particular undertakings, it surely contemplated that she would familiarize herself with information already in her possession—such as the governing documents of the Association. Further, both the business judgment rule and the exculpatory clause of the CC&Rs require good faith and, as discussed *ante*, an absence of diligence may reflect a lack of good faith. Given this overlap, we conclude that at least some of the triable issues of material fact that bar summary judgment with respect to the business judgment rule similarly preclude

28

it as to the exculpatory clause.[11]

Finally, we address Parth's contention that the Association's claim is time barred to the extent that it concerns events that occurred prior to May 22, 2008. Parth contends that there is a four-year statute of limitations for a breach of fiduciary duty claim and that admissible evidence is required to support the claim, but does not explain how these principles would permit her to obtain summary judgment as to a portion of a cause of action. We agree with the Association both that Parth's attempt to apply the statute of limitations to obtain judgment on a part of its breach of fiduciary duty claim is improper and that the existence of material questions of fact preclude resolution of statute of limitations issues at this juncture. (See *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 975 ["there can be no summary adjudication of less than an entire cause of action . . . . If a cause of action is not shown to be barred in its entirety, no order for summary judgment—or adjudication—can be entered."]; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 ["resolution of the statute of limitations issue is normally a question of fact"].)

---

11     We reject Parth's claim that the Association waived the exculpatory clause issue. Although the Association did not address the issue until its reply brief, it takes the position on reply that the exculpatory clause is "a recitation of the business judgment rule." Parth, meanwhile, relied on the same undisputed facts to support both issues. Under the circumstances, we see no reason to preclude the Association from relying on its business judgment rule arguments and evidence for the exculpatory clause issue.

29

B. *Demurrer*

The Association contends that the trial court erroneously granted Parth's demurrer to its cause of action for breach of governing documents, without leave to amend.

1. *Governing law*

We review a ruling sustaining a demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115.) "We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111.) Further, " '[i]f another proper ground for sustaining the demurrer exists, this court will still affirm the demurrer[ ] . . . .' " (*Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 566.)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

2. *Application*

With respect to the Association's cause of action for breach of governing documents, the trial court ruled: "The HOA has not alleged that Parth breached any covenant. The only sections of the governing documents referred to in the cross-complaint are bylaws that deal with the Boards [*sic*] transaction of the Associations

30

[*sic*] business affairs 7-11. These sections describe how the Board acts. It . . . does not appear that they are covenants between the HOA and individual members that the HOA may sue to enforce."

First, the Association does not cite only the Bylaws; it also cites the CC&R provision reserving authority over the Association's affairs to the Board. In any event, we see no reason why the governing document provisions would be unenforceable as to Parth, an owner and Association member who was serving as president and was a member of the Board. (See Civ. Code, § 5975, subd. (a) ["The covenants and restrictions in the declaration shall be enforceable equitable servitudes . . . and bind all owners" and generally "may be enforced by . . . the association"], subd. (b) ["A governing document other than the declaration may be enforced by the association against an owner"]; see also, e.g., *Biren*, *supra*, 102 Cal.App.4th at p. 141 [affirming judgment against director for breach of shareholder agreement]; *Briano v. Rubio* (1996) 46 Cal.App.4th 1167, 1172, 1180 [affirming judgment against directors for violation of articles of incorporation].)

Regardless, as Parth argues, the cause of action for breach of governing documents appears to be duplicative of the cause of action for breach of fiduciary duty. This court has recognized this as a basis for sustaining a demurrer. (See *Rodrigues v. Campbell Industries* (1978) 87 Cal.App.3d 494, 501 [finding demurrer was properly sustained without leave to amend as to cause of action that contained allegations of other causes and "thus add[ed] nothing to the complaint by way of fact or theory of recovery"]; see also *Award Metals, Inc. v. Superior Court* (1991) 228 Cal.App.3d 1128, 1135 [Second

31

Appellate District, Division Four; demurrer should have been sustained as to duplicative causes of action].)[12] The Association does not address Parth's argument or explain how its document claim differs from the fiduciary breach claim. We conclude that the trial court properly sustained the demurrer.

Second, the burden is on the Association to articulate how it could amend its pleading to render it sufficient. (*Blank*, *supra*, 39 Cal.3d at p. 318; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 ["Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading."].) The Association offers no argument on this point and we therefore conclude that it has forfeited the issue. (*Stanley*, *supra*, 10 Cal.4th at p. 793.)

---

[12] But see *Blickman Turkus, LP v. MF Downtown Sunnyvale*, *LLC* (2008) 162 Cal.App.4th 858, 890 (Sixth Appellate District) (finding that duplication is not grounds for demurrer and that a motion to strike is the proper way to address duplicative material).

IV

DISPOSITION

The order granting summary judgment and judgment are reversed.  The ruling

sustaining the demurrer to the breach of governing documents cause of action without

leave to amend is affirmed.  The parties shall bear their own costs on appeal.


AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


PRAGER, J.*

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33